DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Charlene Lohr, appeals from the judgment of the Lorain County Court of Common Pleas, which convicted her of patient abuse and sentenced her to two years of community control sanctions. We affirm.
 {¶ 2} On March 21, 2001, the Lorain County Grand Jury charged Appellant with two counts of patient abuse, in violation of R.C.2903.34(A)(1). Appellant waived her right to a jury trial. On January 30, 2003, a bench trial was conducted. Appellant was found guilty of one count of patient abuse and sentenced to two years of community control. Appellant timely appealed and asserts one assignment of error for review.
 ASSIGNMENT OF ERROR
"[Appellant's] conviction was against the manifest weight of the evidence."
 {¶ 3} In her sole assignment of error, Appellant avers that her conviction for patient abuse was against the manifest weight of the evidence. Specifically, Appellant maintains that the elements of patient abuse were not established by the State as the victim did not testify and physical injury was not proven. Appellant's assignment of error lacks merit.
 {¶ 4} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v.Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id
 {¶ 5} In the present matter, Appellant was convicted of patient abuse, in violation of R.C. 2903.34(A)(1). Pursuant to R.C. 2903.34(A)(1), "[n]o person who * * * administers, or who is an agent or employee of, a care facility shall * * * [c]ommit abuse against a resident or patient of the facility[.]" Abuse is defined as "knowingly causing physical harm * * * to a person by physical contact with the person[.]" R.C. 2903.33(B). One "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The actor must be aware that the conduct may result in physical harm; intent to injure is irrelevant. State v. Perkins (Mar. 27, 1998), 11th Dist. No. 96-P-0221.
 {¶ 6} Physical harm occurs when there is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). See State v.Bacharowski, 5th Dist. No. 2002CA00119, 2003-Ohio-4281, at ¶ 48. Any act, such as a slap that invokes a grimace, will constitute physical harm. Perkins, supra, citing State v. Hustead
(1992), 83 Ohio App.3d 809, 811-12. There is no requirement that pain must be demonstrated by an outward physical manifestation in order to constitute physical harm. Dayton v. Hadley (June 2, 1986), 2nd Dist. No. 9509, citing Legislative Service Note to R.C. 2901.01 (stating that precedent trauma is not a requirement to a finding of physical harm). Furthermore, "[w]hen there is no tangible, physical injury such as a bruise or cut, it becomes the province of the [trier of fact] to determine whether, under the circumstances, the victim was physically injured, after reviewing all of the evidence surrounding the event." Perkins, supra.
 {¶ 7} At trial, Jennifer Hawley ("Hawley"), who worked with Appellant at Center Ridge Nursing Home ("CRNH"), offered her testimony regarding the incident involving Appellant and Mary O'Keefe ("O'Keefe"). Hawley explained that she and Appellant both worked the same shift in the Alzheimer unit at CRNH. Also working that same shift were Jennifer Jones ("Jones") and Kim Mead ("Mead"). Hawley indicated that all the women "got along very well" and did not have any problems with Appellant.
 {¶ 8} Hawley stated that in the summer of 2000,
"there was an incident where [Appellant] asked [her] to help * * * transfer [O'Keefe] into her geri-chair, which is a high-backed wheelchair, so [she] helped [Appellant] transfer [O'Keefe] into the chair. * * * [O'Keefe] screamed a lot and * * * was leaning forward and [they] had to put a tray table in front of [O'Keefe] and she just kept on leaning forward. So [Appellant] pushed [O'Keefe] back in the chair with her hand * * * and [O'Keefe's] head hit the back of the chair and she screamed[.]"
Hawley maintained that O'Keefe was hit "pretty hard" as was evidenced by "[h]er head snapp[ing] against the back of the chair." She did not recall O'Keefe complaining about being injured. However, Hawley asserted that she had only heard O'Keefe speak on one prior occasion and that was simply to say "Happy Birthday." Hawley explained that although O'Keefe "screamed a lot" and was difficult to care for, she did not feel that Appellant's behavior was appropriate under the circumstances. Hawley admitted that, contrary to CRNH's policy, she did not immediately report the incident to her supervisor Mark Walker ("Walker"). Hawley was aware that her continued employment with CRNH could be jeopardized for failing to report an incident of abuse.
 {¶ 9} Thereafter, Hawley discussed the incident with fellow co-workers, Jones and Mead. In September of 2000, Mead, Jones' sister, then went to Walker to make a report because Hawley did not want to be involved and was uncomfortable in doing so. She did, however, eventually speak about the incident with Walker and Toby Tobias ("Tobias"), Director of Nursing, when they confronted her.
 {¶ 10} Additionally, Hawley acknowledged that there were rumors circulating around CRNH concerning a possible relationship between Walker and Jones and that Appellant reported the relationship to management. Hawley conceded that this could constitute a possible motive for Jones to falsely accuse Appellant of abusive behavior. However, Hawley testified that she had no knowledge that Jones was upset with Appellant, and was personally unaware of the rumors concerning Appellant's involvement until after she had spoken about the incident involving O'Keefe.
 {¶ 11} Jones and Officer Vincent Abt, of the North Ridgeville Police Department, also testified at trial. Jones indicated that although she was informed that Appellant was responsible for circulating the rumors about her and Walker, she did not come forward with the abuse charges due to the fact that she was angry with Appellant. Officer Abt stated that he did not recall Appellant mentioning the rumors as being a possible motive for the allegations made against her.
 {¶ 12} Lastly, Appellant testified on her behalf. Appellant explained that O'Keefe required a "two-person assist" when transferring her from her bed to the wheelchair or vice versa. Appellant asserted that she assisted in the transfer of O'Keefe several times and was never abusive even though O'Keefe could be somewhat aggressive. When transferring O'Keefe, Appellant stated that her head would have to be "push[ed]" back in order to place the tray table on the chair. She maintained that she did not forcefully push O'Keefe's head, but rather did so in a slow and gentle manner. However, Appellant had no explanation as to why Hawley testified that O'Keefe's head "snapped back" upon being pushed by Appellant.
 {¶ 13} Appellant indicated that she was both shocked and surprised to learn that abuse charges were brought against her. Appellant asserted that she did not hit or abuse patients. She felt that Jones was "getting back at [her]" for a rumor that she allegedly spread about Jones. Appellant explained that she overhead Jones saying, "whoever started this [rumor], there will be hell to pay[,]" and assumed that Jones was referring to her because the allegations against her were made shortly thereafter.
 {¶ 14} Clearly, the trial court, in weighing the evidence, the credibility of the witnesses and testimony elicited at trial, could have concluded that Appellant was guilty of patient abuse. Moreover, a determination as to what occurred is a question for the trier of fact, and it is not the function of the appellate court to substitute its judgment for that of the factfinder. SeeState v. Jenks (1991), 61 Ohio St.3d 259, 273. It is evident that the judge heard the testimony, weighed the evidence, and rejected Appellant's contention that her co-workers were conspiring against her. Although no evidence was presented of any outward, tangible physical injury, the court could have reasonably concluded that O'Keefe's outcry and the snapping back of her head were outward indicia of injury and pain. SeePerkins, supra; Hustead, 83 Ohio App.3d at 812 (concluding that the sound of the slap followed by the victim's facial expression was sufficient evidence to establish physical harm). Thus, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Appellant of patient abuse. Appellant's conviction is not against the manifest weight of the evidence.
 {¶ 15} Appellant's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
Carr, P.J. and Batchelder, J., concur